IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 14, 2015 Session

# IN RE GABRIEL V.

**Appeal from the Juvenile Court for Davidson County**
**No. 20124159    Sophia Brown Crawford, Judge**

———————————————

**No. M2014-01500-COA-R3-JV – Filed June 24, 2015**

———————————————

Mother and Father were married to other people when the Child was conceived. Mother divorced her husband, but Father returned to his wife and children after the Child was born. Father initiated court proceedings in an effort to be named the Child's primary residential parent and to obtain parenting time. The court performed a best interest analysis and determined that Mother was better suited to be named the primary residential parent. By the time of trial, Mother was living in California, and Father was living in Tennessee. The court awarded Father parenting time during the majority of the summer and shorter periods throughout the year, for a total of about ninety-six days per year. Father appealed, contending the court erred in its best interest analysis and in failing to award him more parenting time with the Child. Father also challenged the court's calculation of child support and credits to which he is entitled. We affirm the trial court's judgment in all regards except for its calculation of child support and credits to which Father is entitled. The case is remanded for a recalculation of Father's child support obligation and arrearage, as set forth herein.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Vacated and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Luke A. Evans and Heather G. Parker, Murfreesboro, Tennessee, for the appellant, Carvin Curtis V.

Cherie Cash-Rutledge, Murfreesboro, Tennessee, for the appellee, Alina Victoria K.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Carvin Curtis V. ("Father") and Alina Victoria K. ("Mother") were married to other people when Gabriel V. ("Gabriel" or the "Child") was conceived in the fall of 2011. By the time Gabriel was born in July 2012, Mother had separated from her husband. Father moved in with Mother during her pregnancy and led her to believe he was going to leave his wife and make a home with Mother. However, Father left Mother's residence to return to his wife ten days after Gabriel was born.

Father initiated court proceedings in the juvenile court in August 2012, when he filed a petition to enter a parenting plan and to establish himself as the primary residential parent of Gabriel. Mother filed an answer and counterclaim stating that she, rather than Father, should be named the primary residential parent. The parties were able to work out only a limited amount of parenting time by Father without the court's help. When asked for its assistance, the court entered an agreed order awarding Father twelve hours on December 29, 2012, in Georgia, where Mother was then living with Gabriel. Mother then filed a motion in January 2013 seeking permission to relocate to California with the Child. The court granted Mother's request and issued a temporary parenting schedule in February 2013 granting Father ten days of parenting time with Gabriel in the months of February, March, April, and May. The court also entered a temporary child support order directing Father to pay Mother $830 per month for Gabriel's support.

The parties tried their case before the juvenile court magistrate on June 19 and 26, 2013. The magistrate entered an order on July 17, 2013, designating Mother the primary residential parent and awarding both parties equal parenting time. Mother and Father were awarded alternating months with the Child. The magistrate granted the parties the opportunity to visit the Child when he was with the other parent so long as the visiting parent gave the residential parent "sufficient advance notice." The magistrate ordered Father to pay child support in the amount of $237 per month and calculated the amount of retroactive child support Father owed dating back to the Child's birth.

Mother objected to the magistrate's decision to grant Father equal parenting time and requested a new trial before the juvenile court judge. The new trial took place in 2014 on January 13, January 15, and April 15. Testimony was offered by Mother, Father, Father's wife, and Gabriel's caretakers in California and Tennessee.

The evidence presented to the juvenile court judge clearly showed that both Mother and Father feel a close bond with Gabriel and that both parents are able to provide appropriate care and nurturing for the Child. Mother testified that it takes up to nine hours for Gabriel to travel from one home to the other. Father testified that Gabriel

2

is well-adjusted and has no trouble getting into his routine in Tennessee once he arrives from California. Father was in favor of maintaining the monthly parenting schedule that the magistrate put into effect. Mother, however, testified that she does not think it is in Gabriel's best interest to travel between California and Tennessee each month. She explained that when Gabriel returns to her after the long trip, he has difficulty adjusting to the changed environment. According to Mother,

> He's very clingy. You can't even walk into the other room without him getting upset, wondering if you're going to leave for a long time. Or how he always wants to keep his eyes on me. He doesn't eat well. He doesn't sleep well. He always has diarrhea.

> His sleep schedule is all messed up because of the time zone change. And he's just not as playful. He just can't jump right into his routine. It takes at least a week to ten days to get him situated and comfortable again.

## II. TRIAL COURT'S ORDER

The juvenile court entered an order following the presentation of all the evidence. Initially, the court noted that both Mother and Father had "unclean hands":

> Both parties appear before this Court with unclean hands. The Mother admittedly had an affair with the Father, a married man, while she was also still married although separated from her now ex-husband. The Father admittedly had an affair with the Mother while married as well as admitting that he had a previous affair during his marriage. Further, the Father admitted to lying to the Mother about them having a future together after the birth of Gabriel.

The court noted that there was no proof that either party interfered with the other's parenting time since the magistrate entered the temporary order in February 2013. Evidence was introduced that Mother exercised her right to visit Gabriel when he was in Tennessee with Father for a month at a time, but Father opted not to come out to California to visit Gabriel when he was with Mother. Father testified that he did not have family or friends in California with whom he could stay and that it was too expensive for him to visit the Child during Mother's parenting time. Mother was a captain in the Air Force, however, and she testified that she could arrange for Father to stay on base for a nominal fee. The court wrote:

> The Court has concerns about the Father's request to maximize his time while not taking advantage of the ability to maximize his time since the entry of the July 12th, 2013 Order. Specifically, the Father chose not to exercise any parenting time during the months that the minor child was

3

with the Mother although the Order provided for this and the Mother was willing to secure on base housing for the Father to defray any housing cost he would incur during his parenting time in California. The Mother, on the other hand, exercised parenting every month the child was with the Father.

The court then considered the factors set forth in Tenn. Code Ann. § 36-6-106[1] to determine which parent should be named the primary residential parent. The court determined that most factors favored both parties equally or were inapplicable to Gabriel. However, the court found that factors (3) and (4) "slightly favor[ed] the Mother" and that factor (10) "favor[ed] the Mother." The court wrote:

> (3) Being the importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment, slightly **favors the Mother** in that the Mother was the primary caretaker of the minor child during the first year of his life.
>
> (4) Being the stability of the family unit of the parents, slightly **favors the Mother** as the Court has some concerns about the stress this situation has placed on the Father's marriage.
>
> . . . .
>
> (10) Being each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child **favors the Mother**.

(Emphasis in original.)

Thus, the court wrote, "the Court finds that it is in the best interest of Gabriel [V.] that the Mother be designated the Primary Residential Parent." The court attached a permanent parenting plan to its order, indicating the days Mother and Father would have parenting time with the Child, and it also attached child support worksheets, indicating the child support Father was required to pay Mother starting from the date of Gabriel's birth.

Father appeals from the juvenile court judge's order and asserts that the court erred in the following ways: (1) ruling that Mother should be the primary residential parent and awarding Father only eighty days per year with the Child; (2) calculating the

---

[1]The text of Tenn. Code Ann. § 36-6-106 is set out in the Analysis section, below.

4

past and current amounts of child support Father is obligated to pay; and (3) failing to make independent findings of fact to support its ruling. Mother asks for an award of her attorney's fees on appeal.

III. ANALYSIS

A. Parenting Plan

When a court is faced with a proceeding in which a child's residential arrangements must be determined, whether the proceeding is a divorce or otherwise, as here, the court must make a "custody determination" that is based on the child's "best interest." Tenn. Code Ann. § 36-6-106(a) (2012). In determining the child's best interest, the court is directed to allow each parent "to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability, and all other relevant factors." *Id.*; *see* Tenn. Code Ann. § 36-6-401(a) ("The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.").

Our review of the trial court's findings of fact is de novo, with a presumption that the findings are correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). We review issues of law de novo, giving no presumption of correctness to the trial court's conclusions. *Armbrister*, 414 S.W.3d at 692; *Kendrick*, 90 S.W.3d at 569-70. Trial courts have "broad discretion" to fashion parenting plans, as the Tennessee Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An

abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

*Armbrister*, 414 S.W.3d at 693. Thus, the *Armbrister* Court concluded, an appellate court will not find that a trial court has abused its discretion unless the trial court's parenting arrangements "'fall[] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Id.* (quoting *Eldridge*, 42 S.W.2d at 88).

Tennessee Code Annotated section 36-6-106 was amended in July 2014. 2014 TENN. PUB. ACTS, ch. 617, § 4. The version of Tenn. Code Ann. § 36-6-106 that was in effect at the time of these proceedings directed the courts to consider the following factors in determining a child's residential arrangements:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

6

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a) (2012).

Father contends that the court erred in applying the best interest factors set out in Tenn. Code Ann. § 36-6-106(a) and determining that Mother should be the primary residential parent. He also argues that in awarding him only eighty days a year with Gabriel, the trial court failed to follow the mandate of Tenn. Code Ann. § 36-6-106(a) that the Child's residential arrangements permit both parents to enjoy the maximum participation possible in his life.

     1. Primary Residential Parent

We will first address the court's determination that Mother should be the primary residential parent. Father contends the trial court erred in finding that factors (3), (4), and (10) of Tenn. Code Ann. § 36-6-106(a) favor Mother. Factor (3) concerns continuity in

the Child's life. At the time of trial, Gabriel was not quite two years old. The testimony was undisputed that, before Gabriel was born, Father knowingly misled Mother into believing he was going to leave his wife and make a life with Mother and the Child. Ten days following Gabriel's birth, Father packed up his things and moved out of Mother's residence. Mother moved shortly thereafter to Georgia, where she had a house and family nearby. Father remained in Tennessee with his wife and two other children. Father spent time with Gabriel after his birth before Mother moved with Gabriel to Georgia, but Mother has been more of a constant in Gabriel's life than Father. The evidence does not preponderate against the trial court's finding that factor (3) favors Mother.

Factor (4) concerns the "stability" of the parents' family units. The court found this factor favored Mother because of the stress "the situation" caused to Father's family. Father's wife testified that she loves Gabriel and treats him as if he were her own when he is in Tennessee visiting Father. However, evidence was introduced that Father's wife was initially very upset when she learned of Father's infidelity and of Gabriel's existence. Father moved out of the house he was sharing with his wife and two other children while Mother was pregnant with Gabriel, and Father's wife testified that she experienced "seven months of really hell" in the months leading up to Gabriel's birth.

Father's other children knew about Gabriel and were permitted to see him after he was born. Before Gabriel was born, there was evidence that the older child suffered anxiety as a result of "the situation." At one point, the older child's friends became so concerned about her that they called an ambulance to come to her house. Father's wife was questioned about what led the older child to become so upset, and she responded:

> Well, let's see, we were in the situation where someone else is having a baby, there's adult things that she wasn't being told, and I think her anxiety came in from not knowing exactly what was going on up until that point.

Father is correct that there was no testimony that Father's wife or older children are currently experiencing stress as a result of the situation Father created by having an extramarital affair and child outside of his marriage. However, the trial court had the opportunity to observe the witnesses, which we are unable to do. "'All we can review is the cold printed word and the exhibits.'" *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007) (quoting *Deitmen v. Deitmen*, No. 86-30-II, 1986 WL 6057, at *1 (Tenn. Ct. App. May 29, 1986)). We cannot say, based on the transcript and the evidence presented regarding the stress that existed prior to Gabriel's birth, that the evidence preponderated against the trial court's finding that Mother's "family unit" is more stable than Father's.

The third factor the trial court found favored Mother is factor (10), which considers the parents' past and potential for future performance of parenting

responsibilities, including the willingness to facilitate and encourage a relationship between the child and the other parent. Other than a few short periods of time when Mother cut off communication with Father during Gabriel's first year, Mother has kept Father up to date with Gabriel's progress and has invited him to spend more time with Gabriel. She has regularly met scheduled appointments to use skype or a similar website to allow Father and his other children to see and speak with Gabriel when he is with Mother, and she has, on her own initiative, sent Father numerous photographs of Gabriel so Father can keep up with his development. She has sought to include Father in decisions regarding Gabriel's childcare, and she has invited him to participate in doctor's visits. Mother has consistently invited Father to visit the Child at Mother's residence. Mother acknowledged that she initially refused to allow Father's wife to accompany him to her house to see Gabriel, but Father fails to explain why he believes Mother should have permitted Father's wife to visit the Child or how that limitation precluded him from visiting on his own.

Once Mother relocated to California in 2013, Father chose not to visit Gabriel at all while he was in Mother's care, despite Mother's offer to arrange affordable housing for him, and despite the fact that Father has had the right to spend time with Gabriel in California since July 2013, when the magistrate entered her order. The only reason Father flies to California is to transport Gabriel from one house to the other. The record does not reflect that Father has ever gone to California for the sole purpose of visiting Gabriel.[2] Mother, on the other hand, testified that she regularly visited Gabriel in Tennessee when he was with Father because she thinks it is important that Gabriel see her as a constant in his life.

Based on the evidence presented at trial, we do not believe the evidence preponderates against the trial court's determination that factor (10) favors Mother and that it is in Gabriel's best interest that Mother be his primary residential parent.

2. Parenting Time

The parenting plan attached to the trial court's order provides in Section "A" that Father will have eighty days per year with Gabriel. When reviewing the detailed day-to-day schedule set forth in section "B," however, it becomes clear that Father will have more than eighty days with Gabriel each year. Before Gabriel begins pre-school, Father will have Gabriel with him in Tennessee for fourteen consecutive days in November, beginning the Wednesday before Thanksgiving; eleven or thirteen consecutive days over the Christmas/New Year holiday[3]; fourteen consecutive days in March; and eight consecutive weeks (fifty-six days) in the summer. Thus, Father will have Gabriel in

---

[2]Father testified that he was going to visit Gabriel in California when he turned one year old, but he changed his mind when Mother told him she did not want Father's wife to come to her house.
[3]Mother and Father alternate years of having time with Gabriel for either eleven or thirteen days in December and January.

Tennessee with him for ninety-five or ninety-seven days until Gabriel begins pre-school. In addition, the parenting plan provides Father the opportunity "to exercise parenting time with [Gabriel] one time per month in February, April, May, September, and October in [California] for a period of up to four (4) consecutive days." Thus, in addition to the ninety-five or ninety-seven days in Tennessee, Father has the option of spending another twenty days with Gabriel in California, for a total of 115 or one 117 days per year.

Once Gabriel begins pre-school, the parenting plan provides Father more time in the summer months and less time during the school year. Father will have Gabriel with him in Tennessee for four days over Thanksgiving in even-numbered years; the entire winter break in odd-numbered years (approximately fifteen days); five consecutive days during spring break; and the entire summer, beginning on the first Friday after school is dismissed until a week prior to the resumption of school in August or September (approximately twelve weeks, which is 84 days). Thus, once Gabriel begins pre-school, Father will have Gabriel with him in Tennessee for either 93 or 104 days, depending on whether it is an even- or odd-numbered year. As is the case before Gabriel starts pre-school, Father will also have the option to spend up to twenty days with Gabriel in California after Gabriel begins pre-school.

We recognize that once he begins pre-school, Gabriel is not scheduled to visit Father in Tennessee for over three months in the fall in those years when Gabriel does not come to Tennessee for Thanksgiving. However, the court has awarded Father time with Gabriel in California during the months of September and October of each year.

Mother testified that she has concerns about the negative effects on Gabriel from spending so many hours traveling from California to Tennessee each month. Tennessee Code Annotated section 36-6-106(a) directs the courts to consider the location of the parents' residences when ordering a custody arrangement. Based on the evidence of the lengthy travel time between Mother's and Father's homes and on the broad discretion trial courts have in setting residential schedules, we do not believe the trial court abused its discretion here in ordering the residential schedule set forth in the parenting plan attached to the court's order.

B. Child Support

Father raises a few issues with regard to the prospective and retroactive child support the court ordered him to pay. He does not contest his obligation to pay; rather, Father contests the calculation and credit he believes he is entitled to receive based on what he has already paid to Mother thus far. We review the trial court's findings of fact de novo with a presumption of correctness, and we will not disturb the court's findings in the absence of a showing that the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Smith v. Smith*, 255 S.W.3d 77, 890 (Tenn. Ct. App. 2007). We review questions of law de novo, with no presumption of correctness. *Smith*, 255 S.W.3d at 890.

The trial court calculated the prospective amount of child support Father owes going forward as well as the arrears Father owes from the date of Gabriel's birth until April 2014. The court split the arrears calculation into two periods: July 19, 2012, until February 2013 and then February 2013 until April 2014.

Mother is employed by the military. She testified that her monthly income is $5361.60 and that she receives a housing allowance (BAH) of $1965 and a food allowance (BAS) of $242 each month. Added together, these amounts total $7,568.60 that Mother receives as income per month. The Tennessee child support guidelines specify that "Basic Allowance for Housing (BAH) [and] Basic Allowance for Subsistence (BAS) . . . for service members are considered income for the purposes of determining child support." TENN. COMP. R. & REGS. 1240-2-4-.04(4)(iii). In its order, the court found that Mother's gross income was $7326 per month.

    1. July 19, 2012, until February 2013

The child support worksheet for the period July 19, 2012, until February 2013, listed Mother's gross income as $5362. The record does not reflect that Mother received less than the full amount of $7,568.60 for this period, and Mother does not so contend in her brief. Thus, Father is correct that the trial court erred when it calculated Father's child support obligation for this period using the number $5362 as Mother's monthly income. In addition, the court gave Mother credit for work-related childcare in the amount of $1,021.25 for this time period. Mother did not testify about any childcare expenses she incurred in this period, however, and Mother did not contend in her brief that she paid any childcare expenses during this period. Thus, the trial court erred in awarding Mother credit for work-related childcare expenses for the period July 19, 2012, until February 2013. Accordingly, we remand this issue to the trial court to recalculate the child support that Father was obligated to pay for the period July 19, 2012, through February 2013. The court shall calculate Father's obligation based on Mother's gross monthly income of $7,568.60, and no credit shall be given Mother for work-related child support expenses during this period.

    2. February 2013 until April 2014

The child support worksheet for the period February 2013 until April 2014 that was attached to the court's order listed Mother's gross income as $7326. Her income should have been listed as $7,568.60, as discussed above. The parties shared equal parenting time with Gabriel during this period. Father testified that he paid $40 per day in childcare expenses from August 2013 through April 2014, which testimony was undisputed. The child support guidelines indicate that a parent's childcare expenses "shall be averaged for a monthly amount" for purposes of the child support worksheets. TENN. COMP. R. & REGS. 1240-2-4-.04(8)(c)(1). Father asserts that averaging his

childcare expenses over an entire year, he is entitled to a credit of $360.83 per month for his work-related childcare expenses during this period. Mother does not contest Father's argument in this regard.[4] Thus, the trial court shall recalculate the amount of Father's child support obligation for this period on remand as set forth herein, by increasing Mother's gross income to $7,568.60 and granting Father work-related childcare expenses of $360.83 per month.

### 3. April 2014 Forward

The trial court's child support order for the period August 2014 forward included the same error regarding Mother's gross income. The amount of Mother's gross income should have been $7,568.60, not $7326, as already discussed. Moreover, Father should be awarded an amount for work-related childcare expenses of $40 per day for the periods in which Father has Gabriel with him in Tennessee. The worksheets for this period reflect that Father has visitation with Gabriel for eighty days per year, which is incorrect. As discussed above, Father will have Gabriel with him in Tennessee for about ninety-six days per year, on average. Thus, the court shall use this number in calculating Father's child support obligation going forward rather than the eighty day number contained in the current schedule.

### 4. Credit to be Awarded Father

Father also takes issue with the amount of credit the trial court awarded him for child support he alleges he has already paid. The court awarded Father a credit of $6095 to be applied to his balance for arrears. This amount represents $2400 in child support payments Father paid pursuant to a court order from August 2013 until April 2014 and $3695 that includes the cost of a crib, stroller/car seat, clothes washer, and rent. Mother does not contest the amount of this credit, but Father alleges he should have been credited an additional $4980 for child support he paid pursuant to a temporary order issued February 6, 2013, which required Father to pay $830 per month beginning February 1, 2013. Father asserts he paid this amount each month from February through July 2013, when the magistrate reduced his obligation to $300 per month beginning August 2013. In her order dated July 12, 2013, the magistrate noted that Father was current with his monthly child support payments of $830, and Mother acknowledged at trial that Father was current with his court-ordered payments. In the face of this undisputed evidence, we conclude that the trial court erred in failing to credit Father with these payments, which total $4980.

---

[4]In her brief, Mother states only that the trial court correctly determined the amount of arrears Father owes and that the numbers included in the child support worksheets are correct. She does not challenge the specific arguments Father makes with regard to the determination of Mother's gross income, Father's credits, or the determination of work-related childcare expenses.

Father also asserts he should have been credited with $1300 for money he gave Mother to cover her rent as well as money he spent on clothing for the Child. Tennessee case law provides that an obligor parent can earn credit against a child support arrearage for "necessaries" the parent provides to a child if those necessaries are not provided by the other parent. The Court of Appeals has explained the rule thusly:

> With respect to the "forgiveness of arrearages," it is well settled that non-custodial parents may be given credit against their child support obligation for payments made on behalf of their children if such payments are for necessaries that the custodial parent either failed to provide or refused to provide. *Brownyard v. Brownyard*, 1999 WL 418352 (Tenn. Ct. App. June 22, 1999); *Hartley v. Thompson*, 1995 WL 296202 (Tenn. Ct. App. May 17, 1995); *Oliver v. Oczkowicz*, 1990 WL 64534 (Tenn. Ct. App. May 18, 1990).

*Peychek v. Rutherford*, No. W2003-01805-COA-JV, 2004 WL 1269313, at *4 (Tenn. Ct. App. June 8, 2004); *accord Estes v. Estes*, No. M2010-01243-COA-R3-CV, 2012 WL 1357550, at *5-6 (Tenn. Ct. App. Apr. 16, 2012); *Netherton v. Netherton*, No. 01-A-01-9208-PB00323, 1993 WL 49556, at *2 (Tenn. Ct. App. Feb. 26, 1993).

Mother does not dispute the trial court's decision to credit Father with a portion of the rent Father paid for Mother and Gabriel. However, Father provides no explanation as to why he should receive additional credit against his child support arrearage for additional rental payments he may have made for Mother and Gabriel. Father's sparse argument fails to convince us that his rent payments constitute "necessaries" for the Child, as that term has been interpreted and applied by the courts of this State when determining how much, if any, credit should be applied toward an obligor parent's child support arrearage. We will not disturb the trial court's decision to credit Father's arrearage in the amount of $1750 he paid for rent because Mother did not contest this credit, but we will not award Father an additional credit for other rent money he may have paid. With regard to clothes Father may have purchased for Gabriel, he merely speculated when testifying about the amount he spent; he was not certain of the amounts he may have spent. Father's proof was insufficient to justify additional credit.

In sum, when the trial court recalculates Father's arrearage on remand, the court shall credit Father with $4980 in addition to the $6095 it initially calculated, for a grand total credit of $11,075. This amount shall be credited towards the arrearage Father owes for child support. To the extent the credit is more than the arrearage, the court shall credit Father with any overage to be applied to his prospective child support obligations.

## C. Trial Court's Independent Findings

Father's final argument on appeal is that the trial court failed to make independent findings of fact to support its conclusions. The basis for Father's argument is that the court asked each side to submit proposed findings of fact at the conclusion of the trial and that the court "merely accepted the proposed findings contained in the order submitted by counsel for Mother."

Contrary to Father's depiction, the trial court judge was very involved with the trial of this case, interjecting during different witnesses' testimony to ask questions and clarify issues. Father primarily contends the court failed to give him credit for child support that he has already paid, but we have corrected that herein to the extent such credits are supported by the proof. Contrary to Father's contention, the trial court addressed each of the best interest factors to determine which party should be named the primary residential parent, and it provided reasons, that are supported in the record, for determining which factors favored Mother. As our Supreme Court has stated, "it is permissible for the trial court to authorize counsel to prepare and to submit a proposed order for the court's consideration." *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 312 (Tenn. 2014).

The court did not indicate which way it was planning to rule at the end of the trial when it asked the parties to submit proposed findings of fact. Moreover, the record does not contain the proposed findings submitted by each of the parties. We do not know, therefore, how much of Mother's proposed findings the court included in its order. We do know, however, that the material findings the court included in its order that provide a basis for its conclusions of law are supported by the record. Father has not shown how, if at all, the trial court failed to exercise its own independent judgment in this case. Accordingly, Father cannot prevail on this argument.

## D. Attorney's Fees

Mother seeks an award of her attorney's fees for having to defend this appeal. Mother gives no statutory or other basis for requesting an award of her fees. This Court has discretion to award a prevailing party attorney's fees on appeal in cases involving a child's custody and/or enforcement of a child support order. Tenn. Code Ann. § 36-5-103(c); *see In re Ra'Niyah T.*, W2014-00680-COA-R3-JV, 2014 WL 4384702, at *15 (Tenn. Ct. App. Sept. 5, 2014) (holding that only the prevailing party is entitled to recover attorney's fees pursuant to this statute). Both Mother and Father prevailed on different issues in this appeal. Neither party, therefore, is entitled to an award of fees in this case.

## IV. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment naming Mother the primary residential parent of Gabriel. We vacate the child support portion of the judgment and remand the case to the trial court for a recalculation of Father's child support obligation, as set forth above, and for a determination of the amount of his arrearage, if any, taking into account the credits to which Father is due, consistent with this opinion.

_____
ANDY D. BENNETT, JUDGE